HAGERSTOWN & FREDERICK RAILWAY COM-
PANY, A CORPORATION,

*vs.*

CARRIE G. WINGERT.

*Negligence: evidence to connect with injury.   Common carriers:
duty to passengers; ordinarily not to assist in alighting.*

In actions of damages for injuries caused by alleged negli-
gence, there must be evidence legally sufficient to prove negli-
gence and to connect that negligence with the injury, before a
court is justified in letting the case go to the jury.          p. 457

Ordinarily there is no duty on the part of a carrier to assist
passengers in boarding or alighting from its trains or cars.

p. 458

The duty may arise, however, from special circumstances, as
when there is some unusual danger or difficulty from the place
or means of alighting, or the condition under which the party is
required to alight.                              p. 458

In alighting from the right-hand side of a summer car, the
plaintiff had hold of the handbar with her right hand; when
she went to make a step on the running board to the street, she
found that she could not reach the street with her foot, and so
let go the handbar and stepped off; in doing so, she fell to the
ground; *held,* that there was no evidence in the case to show
negligence on the part of the defendant in the use of the car,
as it may have been that she was required to let go the hand-
bar, because she was holding it with her wrong hand, or that
she had taken hold of it too high up.                 p. 467

*Decided January 14th, 1919.*

Appeal from the Circuit Court for Washington County. (KEEDY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Frank G. Wagaman* and *Alexander Armstrong,* for the appellant.

*Henry H. Keedy, Jr.,* and *Albert J. Long,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered by the appellee, Carrie G. Wingert, against the appellant, The Hagerstown & Frederick Railway Company, for personal injuries sustained by her in alighting from the defendant's car, upon Washington street, in Hagerstown, resulting from the alleged negligence of the appellant corporation: (1) in the use of a car having its foot-board of a "dangerous, unusual and extraordinary distance" above the ground or street, (2) in not providing for the plaintiff a step or some other proper object to assist the plaintiff in stepping or alighting from said car or foot-board to the street below, (3) in not warning the plaintiff of the alleged excessive, dangerous and extraordinary height of the car step above the street, and (4) in not assisting the plaintiff in alighting from the car.

The plaintiff, at the conclusion of the case, offered five prayers. Of these, the first, second, fourth and fifth were granted. The third was refused. The defendant offered nineteen prayers. Its first, second, third, ninth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and eighteenth were rejected. Its fourth, fifth, sixth, seventh, tenth, sixteenth,

seventeenth and nineteenth prayers were granted, and its eighth prayer granted as modified.

The defendant excepted to the rulings of the Court in granting the plaintiff's first, third and fifth prayer, and in rejecting its second, third, ninth, eleventh, twelfth, fifteenth and eighteenth prayer. This is the only exception found in the record.

The defendant's first prayer asked the Court to instruct the jury that there was no legally sufficient evidence entitling the plaintiff to recover. This prayer, we have said, was re-fused.

A number of times has this Court said that there must be evidence legally sufficient to prove negligence and to connect that negligence with the injury, before a Court is justified in allowing a case to go to the jury. *Baltimore & Yorktown Turnpike Road* v. *Cason,* 72 Md. 380; *Callis* v. *United Railway & Electric Co.,* 128 Md. 411, and other cases. There are cases, however, where the proof of the injury has, under certain circumstances, raised a presumption of negligence on the part of the carrier. *B. & O. Railroad Co.* v. *State, Use of Mahon,* 63 Md. 144, but this case does not come within that class of cases.

The car used on this occasion and the one in which the plaintiff was riding was what is known as an open summer type car, with running boards and steps extending along its entire length. The passengers made their exit by stepping from the car to the running board and then to the step below and from the step to the ground or street. The accident occurred on the evening of the 26th of June, 1916, between ten and eleven o'clock. The car stopped at a point on West Washington street in Hagerstown at or near the public square and in front of Hoffman's dry-goods store. This was in what is known as the Great White Way of Hagerstown.

William H. Reynolds, a policeman of that town testified that on June 26th, 1916, he was in charge of the White Way Light. The lower lights were turned off at eleven o'clock, the top lights were left on until day-light in the morning.

One of these White Way poles stands right in front of the door of Hoffman's store. That pole like all the others has three lights.

Other witnesses who testified expressed some doubt as to all of the lights being on at the time of the accident, but Mrs. Wingert, the plaintiff, testified that as she approached the square, she noticed her daughter standing in front of Hoffman's store, thus showing that the street was sufficiently lighted, not only for her to see but to recognize her daughter standing in front of the store, some distance away. The street at this point, which was paved with vitrified brick, was on a level with the top of the car rail.

The Court below in granting the defendant's fifth prayer, held there was no evidence in the case legally sufficient to entitle the jury to find that the defendant was guilty of any negligence in the failure to furnish the plaintiff with any movable step to assist her in alighting from said car and in the failure of the employees of the defendant to assist said plaintiff in alighting therefrom. This was, a proper ruling upon the evidence offered.

Ordinarily there is no duty on the part of a carrier to assist passengers in boarding or alighting from its train or cars. See cases cited in note to *Louisville & Nashville Railroad Co.* v. *Ellen Dyer,* 48 L. R. A. (N. S.) 816.

The duty, however, to assist passengers off and on trains and cars may arise from special circumstances, as when there is some unusual danger or difficulty from the place or means afforded for alighting, or the condition under which the party is required to alight, or otherwise, makes it reasonably apparent at the time that difficulties or dangers attend the act of alighting. Note to *Louisville & Nashville R. R. Co.* v. *Ellen Dyer, supra.*

In the case before us, we find no unusual danger or difficulty arising from the condition of the party or the place where the plaintiff was to alight from the car or the means afforded her of alighting or otherwise that were apparent to the defendant or its agents that made it their duty to assist

her from the car, or of which she should have been warned or notified. Therefore, the sole remaining act of negligence charged against the defendant is the use of the car with the foot-board or step of the alleged dangerous distance above the ground.

The plaintiff offered several witnesses who testified that they, on different occasions in getting on the train, had heard others complain in the presence of the conductor about the step being so high and that they could hardly get on the car. One of these was asked by the counsel for the plaintiff, "Did you make any complaint to any of the operators or any of the officials of the Hagerstown & Frederick Railway Co., in reference to the difficulty in getting on and off that car," and she replied, "Not seriously jokingly I did in way to ridicule the car."

Mr. Long, one of the counsel for the plaintiff, testified that he measured the car, which was car No. 101, at Frederick, on Tuesday immediately preceding the trial of the case, and that from his measurement it was 22 8/10 inches from the top of the lower foot-board to the top of the rail. His measurement was made, as he states, with a "Western Maryland Standard Tape Line." He also measured car No. 103, which measured 18 inches from the top of the step to the top of the rail. This it seems was measured at Hagerstown.

Upon cross-examination, he stated that 101 was in the car barn at Frederick, the last car in the barn, clear back against the rear end of the track at the time he measured it. The interior of that barn is not paved. It is on the dirt." He was then asked: "Therefore, when you got down from the car you had to get down on the ground? A. The ground was not over an inch from the rail; the ground was level with the rail. Q. The distance then from the top of the step to the ground itself would have been about an inch more then? A. I did not measure that. I take it as about an inch. Not much over an inch if it was any."

The plaintiff, at that time a resident of Hagerstown, on the morning of the day of the accident, went to Williamsport

in one of the cars of the defendant company and returned in the evening of that day in car No. 101. She testified that: "I got on the car at Williamsport and didn't notice then any difference between the height of the step and the height of the step on the loop car, because I was assisted on. It did seem a little higher, but I was assisted and couldn't tell. I don't think I got on the same kind of a car to go over to Williamsport as I did when I came back but I can not tell. I don't know which car I was on. I was not accustomed to riding on the car at Williamsport. The car that I got on to go to Williamsport was a summer car, a big summer car, with two steps leading up to the floor of the car, a step from the ground and then a step to the running board and then into the floor of the car, just like the one I came back on. I didn't notice the height of the step on that car; in leaving Hagerstown my daughter was with me and she assisted me on and I didn't even notice the height of the step then." She further testified: "I got off the car at Hagerstown right in front of Mr. Hoffman's dry-goods store. I stepped off the car and there were two steps; I first stepped on one, then on the second, and I looked down and the distance didn't seem so great, and as I stepped down, my foot didn't touch the ground, and I had to leave go of the hand hold of the car, and I felt the bones crushing into my knee, and naturally I had to fall." She was then asked: "Q. The question is how the height of the car that you came from Williamsport on compares with the step on the cars that you had been accustomed to riding on, higher or lower, or the same? A. A great deal higher than the one on the Potomac street line, as I never had found any difficulty in stepping off. I first discovered that there was this difference in stepping off the evening that my limb was broken. When I stepped off at the square, my hand on the rail, I was looking down to see the distance of the step. In stepping from the car, I couldn't detect the distance of the lower step down to the ground. If I had, I would have used more precaution in stepping down * * *. I stepped on the first step, then on the second step,

and found in stepping to the ground, the step was so great that I could hardly make it, but I was too far down to help myself * * *. I first discovered that the step was further down than I imagined as I stepped to the pavement and found that I couldn't reach the pavement."

The plaintiff's daughter, Miss Florence Wingert, who was standing in front of Hoffman's store as the car approached stated that "When the car pulled in at the stopping place, I looked at them (her mother and sister), and saw them get off the car. My sister was behind my mother and she stepped down on the first step and the second and went to step down to the ground and the ground appeared too far for her to reach the ground and she let go the hand hold and went right down to the ground." Upon cross-examination, she stated: "I saw my mother put both feet on the top step and bottom I don't know what she was doing with the left hand." step, step off with the left foot and hold with the right hand.

George M. Hett, a surveyor of Braddock Heights, produced as a witness by the defendant testified that: "Yesterday I made measurement of car No. 101 of the Hagerstown & Frederick Railway Co. I measured the distance from the height of the step on a level with the track and did so by laying a straight edge across on the top and measured straight up from the top edge of the step to the top rail. I used a steel tape that I used in surveying. The distance, as I measured it on top of the step on Car 101 to the top of the rail, was 19 inches. This morning I measured Car 103 that is the car at the old barn in Hagerstown, to ascertain the height of the step to the level of the track. I measured in the same way and found the distance there from the top of the step to the top of the rail was 18½ inches." He also measured eight other cars of the defendant company, all of which had running boards, and the distance from the surface of the lower step to the surface of the rail, measured as follows, to wit: Car No. 88—17½ in.; No. 79—17 in.; No. 78—18 in.; No. 84—20½ in.; 86—17 in.; 85—19½ in.; 22—20 in.; 20—20 in.; 102—18 in.

J. B. Ferguson, a civil engineer, R. E. Etzler, engaged in manufacturing at Hagerstown, Charles E. Hutzberry, Manager of the Postal Telegraph Company, at Frederick, C. M. Hoffman, time keeper for the Potomac Lime & Stone Co., at Middletown, Isaac Welty, a laborer, and George Groshon a clerk, both of Frederick, Leslie Blenninger, a school teacher of Braddock Heights, Martin Stockman, a farmer near Braddock Heights, D. E. Stein, master mechanic, and Paul Smith, Supt. of the defendant company, all testified that they also measured car No. 101 by laying a straight edge across the rails and measuring from it to the top of the step, and that it measured, as stated by Mr. Hett, 19 inches from the top of the step to the top of the rail or street; and most of these witnesses testified that they also measured the other cars of the company mentioned by Hett in his testimony, and their measurements practically corresponded with those made by Hett, given above.

Mr. Stein further testified that he measured car No. 101 on the same day that it was measured by Mr. Long, while it was in the same position in the barn, and stated that the surface of the ground between the tracks of 101 was three or four inches below the top of the rail. He also said that car No. 101 had been in use by them for seven or eight years, that it was a Jackson and Sharp make of car and was bought by them in New York.

B. W. Duncan, of Brunswick, Maryland, Manager of the C. & W. Electric Line Interurban Railway running from Cumberland to Westernport, testified that he had been manager of said company for more than two years, that prior to that time he was superintendent of the Sedalia Light & Traction Co. for two years, was train master for the St. Joseph Light, Heat & Power Co. four years, and conductor and motorman eight years for the St. Joseph, Light, Heat & Power Co., that during his connection with said roads he had occasion to observe the height of steps of summer cars on their road. He was then asked: "What height of steps was used on those roads? A. From 17 inches to 23 inches. On two

cars of the larger seating capacity the distance was 22½ inches. Q. Was there in general use on those roads any car with steps 19 inches high? A. Yes, sir; on the Sedalia property there were eight. I can not say how many on the other property, operated about sixty cars there." He further testified "that there are certain mechanical and engineering reasons for placing the steps approximately 19 inches from the surface of the rail in an open summer car. One reason is the height of the wheels. Your car body has to be above the wheels otherwise your car body over the wheel would have a very dangerous covering in getting in and out of the car; people would naturally stumble over it, and a journal box would make it very dangerous. The height of the wheel of the car necessarily raises the body of the car. To lower the body of the car and to retain the height of the wheel, the wheel would have to go up into the body of the car and be covered there and that covering would be dangerous, the step coming down over the journal and your journal sticking out, your step would have to come quite a way out * * *. It is necessary to have the step close to the car to have it over the journal box and that position then requires a height above the journal box for the step." Upon cross-examination he stated that there was no connection between the Cumberland and Westernport Railway Co. and the Hagerstown & Frederick Railway Co.

Robert D. Sefton of Waynesboro, Manager of the C. G. & W. Railway Co. for about ten years, testified that he, during his connection with that company, had occasion to observe the height of the lower step on the open summer type car, and had made observations along that line in roads other than his own. He said whenever he went into a strange town and rode on that type or car, he would "Invariably measure the running board distance from the top of the rail to the top of the running board." That he had made these measurements in Baltimore, Pottsville, and other places, and that open summer type cars, having the lower step a distance of 19 inches from the surface of the rail, are in general use in that part

of the country. He also testified that his company operated
a line running from Blue Ridge to Chambersburg, the nearest point to Hagerstown being Shady Grove about ten miles
away.; that the height of the lower step from the top of the
rail on the summer cars in use by his company is between 18
and 19¼ inches; that the cars in Pottsville "ran 18 to 21
inches, Philadelphia ran 18 to 22 inches." He did not remember the measurement of those in Baltimore but he
thought the distance was about 19 inches; that these cars had
been in use upon his road for about seven or eight years; that
the controlling stock of his company, since December 1st,
1917, has been held by the defendant company. He also
testified that the hand hold upon this type of cars is at the
end of each side and the average person should be able to
hold on to it until they alighted upon the ground, as the
average car is not four feet high.

Edgar Hern, instructor of motormen for the United Railway & Electric Co. of Baltimore, whose duty it is to operate
trolley cars in Baltimore, with some few lines running out on
suburban roads, and who had been connected with that company a little more than twenty-five years, testified that his
company had one type (summer cars) "where the height of
the side steps from the surface of the rail is 20 inches and
the body 17 inches, and another type where the rails are 19
inches and the steps 17 inches from the body. All of the
summer cars operated by our company in Baltimore and
suburbs are of the types which I have just mentioned, with
the steps either 19 inches or 20 inches from the surface of
the rail. Our company has used cars of this type as summer
cars for between fifteen and eighteen years, and are now used
in summer time * * *. On our cars a passenger is not only
required to step 17 inches from the ground to the step but
then is required to step 17 inches from the step into the car.
The experience of our company with that type of car is that
they have gotten along without any complaints out of the
ordinary, and without any accidents only due to the persons
slipping or getting off before the car stops, something of that

sort"; and during that time they had purchased new cars to renew their summer equipment of practically the same type, and had purchased no other with the exception of the semi-convertible car. Upon cross-examination, however, he testified that accidents were not reported to him.

Joseph E. Wayne of York, Pa., Supt. of the York Ry. Co., which is engaged in hauling passengers and freight on trolley cars in the City of York and York County, with about ninety miles of track, testified that he had held the position of superintendent of that road for nine years. "That his company used cars with the lower step 19 inches from the surface of the rail; that they had fifteen of these cars; that in addition to those fifteen, they also had cars with steps of approximately that height." He further said: "We hauled nine million passengers last year on the whole system." All accidents were required to be reported to him. He was then asked: "Will you state what the experience of your company has been with reference to accidents due to injury to passengers alighting from the lower steps of said cars standing still at the time the passengers were getting off? A. I can not recall any accident from passengers getting off open cars with the cars standing."

M. A. Pooler, Manager of the Hagerstown & Frederick Railway Co. for three and one-half years, and prior to that connected with the Youngstown & Sharon Street Railway Co. and the Mahoning & Shenango Railway & Light Co., companies engaged in the operation of electric cars, testified that when he was with the said companies he was in charge of railway sub-stations. "They had in operation open summer cars with running boards along the side. I know the height of the lower step from the ground on two types of the cars that I saw there in use, one a ten tonnage open car had a step 18 inches, and the other a fifteen tonnage double truck car, 21 inches. There were six cars of the latter type in operation when I was there, and there were probably twelve or fifteen of the other type. I was there five years."

Paul Smith whom we have said was superintendent of the defendant company testified that the company had owned car No. 101 seven years, eight years the coming August, and it "will be fair to state that approximately one hundred thousand passengers a year have been carried on that car during the seven years the company owned it," and "no accidents arising from the height of this step has ever been brought to my attention, although I was the officer of the company to receive all notices of accidents and complaints.

As we have said, the sole remaining question under consideration is whether the evidence offered is legally sufficient to go to the jury as tending to show negligence on the part of the defendant in the use of the car with its steps the distance from the ground disclosed by the record in this case. There is no complaint that the steps were out of repair, or that their condition was such as to make their use dangerous, and there is no evidence that the distance of the step from the ground was greater than the exigencies of the business and the operation of the road required.

The evidence of those familiar with the operation of electric roads is that such construction is necessary in order to avoid conditions dangerous to passengers on the cars, and the evidence of the plaintiff shows no other method of construction that could be adopted by which the height of the steps might be lowered and the conditions pointed out by the witnesses referred to as dangerous to passengers be avoided, nor is there any evidence that any accident ever happened to anyone in the operation of defendant's road resulting from the negligence here complained of, but on the contrary the evidence shows that in this very car, which had been used for seven years, at least one hundred thousand passengers—men, women and children—had each year ridden, without injury to any of them resulting from the negligence complained of; and it may be further added that during all of said time there had never been any serious complaint made in reference to it. *Laffiin* v. *Buffalo & S. W. R. R. Co.* (N. Y.), 12 N. E. 600. Under such circumstances, how can it be prop-

erly said that the defendant was guilty of negligence in the use of said car? The evidence of such negligence, under such circumstances, can not be found in the fact that the plaintiff, in her testimony, states that she had to let go the hand hold of the car in stepping from the step to the ground. If she grasped the hand hold too high such would be the result, but we are not to assume that she could not have grasped it at a lower point, where she could have made the step without breaking her hold thereon. Or it might have been that she used the right hand when she could have used the left. The inference should not be drawn that because she was required to break her hold, that the hand hold upon the car did not extend to a point where she could have used it with safety in stepping from the step to the ground.

The Court, we think, should have granted the defendant's prayer asking that the case be taken from the jury because of the want of evidence legally sufficient to show negligence on the part of the defendant in the use of said car.

We will, therefore, reverse the judgment below without a new trial.

> *Judgment reversed without a new trial, appellee to pay the costs.*